James E. Cecchi
Lindsey H. Taylor
Kevin G. Cooper
**CARELLA, BYRNE, CECCHI,**
  **OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone:  973/994-1700
Facsimile: 973/994-1744
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com
kcooper@carellabyrne.com

Stuart A. Davidson
Alexander C. Cohen
**ROBBINS GELLER RUDMAN & DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
acohen@rgrdlaw.com

*Attorneys for Plaintiff and the Class*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANTHONY A. OLIVA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN FINANCIAL RESOURCES, INC.,<br><br>Defendant. | Civil Action No.<br><br><br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Anthony A. Oliva, PhD ("Dr. Oliva" or "Plaintiff"), individually and on behalf

of all those similarly situated (the "Class" or "Class Members"), upon personal knowledge of the

facts pertaining to himself, and on information and belief as to all others, and upon the investigation

conducted by his counsel, bring this Class Action Complaint against Defendant American Financial Resources, Inc. ("AFR" or "Defendant") to obtain damages, restitution, and injunctive relief, and in support thereof, states as follows:

## I.     NATURE OF THE ACTION

1.     This matter arises from a data breach of the personal information of consumers who utilized AFR for residential mortgage services, including those, like Plaintiff, whose personal information AFR retained long after it should have been destroyed (the "Data Breach").

2.     As a result of the Data Breach, unauthorized third parties accessed the sensitive data of consumers who utilized AFR's services.  Because of the Data Breach, thousands of Class Members' suffered ascertainable losses, such as of out-of-pocket expenses and the value of their time incurred to remedy or mitigate the effects of the attack and the present and substantial risk of imminent harm caused by the compromise of their sensitive personal information, including their name, Social Security number and Driver's License number (hereinafter, the "Personally Identifiable Information" or "PII").

3.     While the Data Breach occurred from December 6, 2021 through December 20, 2021, AFR purportedly did not determine what information was accessed until February 4, 2022.

4.     To make matters worse, after discovering that Plaintiff's and the Class Members' highly sensitive PII was accessed, AFR then sat on the information for over a month – failing to disseminate data breach notifications until March 9, 2022.

5.     When highly sensitive PII is accessed by unauthorized third parties in events like the Data Breach, every moment is precious to ensure that that PII is not then weaponized against the rightful owner of that PII through identity theft. Sitting on this information allowed AFR to

dodge responsibility and worsened the Data Breach victims' chances at weathering the storm that AFR caused.

6.      As a result of the Data Breach, Plaintiff and the Class Members have been harmed, including – as in Plaintiff's case – falling victim to identity theft and fraud. Moreover, even those who have not suffered from identity theft and fraud are now at a greatly heightened and imminent risk of fraud and identity theft. As a result of the Data Breach, Plaintiff and the Class Members must now and forever closely monitor their financial accounts to guard against said identity theft and fraud.

7.      Plaintiff and the Class Members may also incur, or have already incurred, out-of-pocket costs directly tied to the Data Breach, for example, through having to purchase credit monitoring systems, credit freezes, or other protective measures to deter and detect identity theft. Plaintiff seeks to remedy those harms on behalf of himself and all similarly situated persons whose PII was accessed unlawfully during the Data Breach. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement for out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems and protocols, future annual audits, and adequate credit monitoring services funded by the Defendant.

8.      As such, Plaintiff brings this Class Action Complaint against Defendant seeking redress for its unlawful conduct, asserting claims for: (1) negligence, (2) negligence *per se*, (3) breach of confidence, (4) intrusion upon seclusion, (5) breach of implied contract, (6) unjust enrichment, (7) violations of New Jersey state consumer protection statutes, and (8) violations of Florida state consumer protection statutes.

## II.    JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act because: (1) there are more than 100 putative Class Members; (2) the aggregate amount-in-controversy, exclusive of costs and interest, exceeds $5,000,000.00; and (3) there is minimal diversity as required by the statute because Plaintiff and Defendant are citizens of different states.

10.    This Court has personal jurisdiction over the Defendant because the Defendant is from this District. Additionally, this Court has personal jurisdiction over the Defendant because they have substantial contacts with this District and have purposely availed themselves to the Courts in this District.

11.    In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to the Plaintiff's claims occurred in this District, the Defendant is headquartered in this District, and the Defendant transacts business within this District.

## III.    PARTIES

12.    Plaintiff, Anthony A. Oliva, PhD, is a citizen of the state of Florida and resides in West Miami, Florida.  Defendant notified Dr. Oliva of the Data Breach and the unauthorized access of his PII by sending him a Notice Letter, dated March 9, 2022, and attached hereto as **Exhibit A**.

13.    Defendant, American Financial Resources, Inc., is a domestic corporation organized under the laws of New Jersey, and maintains its principal place of business at 9 Sylvan Way, Parsippany, New Jersey, 07054.

IV.     **FACTUAL ALLEGATIONS**

A.     **Defendant's Business**

14.     Nationwide, AFR serves the residential financing needs of mortgage brokers, bankers, lenders, homeowners, home buyers, realtors, and contractors.

15.     In doing so, AFR offers services as a full-service mortgage lender, serving wholesale, correspondent, and consumer direct channels.   AFR offers a variety of options, including FHA, VA, USDA, Ginnie Mae, Fannie Mae, and Freddie Mac.  In addition, AFR is a top lender in 203(k) lending for sponsored originations, and is one of the nation's leading renovation and manufactured home lenders.  In providing these services, AFR offers an extensive program suite, and "cutting-edge technology."

16.     AFR holds itself out to be "a group of trusted, innovative, and responsive mortgage professionals who … bring a dedicated focus to simplify the lending process."

17.     In the course and scope of its residential financing business, AFR collects massive amounts of highly sensitive PII, including but not limited to, Social Security numbers, employment information (including tax returns, W-2's, pay stubs, and letters regarding employment history), credit histories and letters regarding credit events, investment information, addresses, dates of birth, and Driver's License information.

18.     With respect to Social Security numbers, AFR states in its Privacy Policy that:

> Social Security numbers are classified as "Confidential" information under the AFR Information Security Policy. As such, Social Security numbers may only be accessed by and disclosed to AFR employees and others with a legitimate business "need to know" in accordance with applicable laws and regulations. Social Security numbers, whether in paper or electronic form, are subject to physical, electronic, and procedural safeguards, and must be stored, transmitted, and disposed of in accordance with the provisions of the Information Security Policy applicable to Confidential information. These restrictions apply to all Social Security numbers

collected or retained by AFR in connection with customer, employee, or other relationships.

19.    And, with respect to privacy in general, AFR states that it is "committed to your financial well-being and protecting the privacy and security of the information you share with us since our inception in 1997."

20.    AFR also makes public representations on its website regarding what information it shares:

> We may share information with service providers with whom we work, such as data processors and companies that help us market products and services to you. When permitted, or required by law, we may share information with additional third parties for purposes including response to legal process.
>
> When you submit a loan application to us, we may ask for information that may include where you work, what you do, your income, assets, debts and obligations, your financial goals and other similar information. We use this information when evaluating your eligibility for a loan. This evaluation also requires us to obtain information about you from others such as consumer reporting agencies (also known as credit bureaus), the IRS, licensed title search companies, and your hazard and/or flood insurance company.
>
> In addition, American Financial Resources, Inc. may provide third party firms with information furnished by you, such as names, addresses and the financial information you have provided to us or that we have obtained from others about you. Any use of this information will be restricted to advancing your request for a loan, locating a home, or the marketing of other financial products American Financial Resources, Inc. may offer. We will never sell information about you to any other organization.
>
> We may also provide certain information to others when legally required to do so (for instance, in response to a subpoena), to prevent fraud, or to comply with a request by a government agency or regulator.

21.    By obtaining, collecting, using, and deriving benefits from Plaintiff's and the Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting said PII from unauthorized access and disclosure.

22.    AFR was plainly aware that it should destroy any PII that it no longer needed to service a mortgage (*e.g.*, where AFR sold its mortgage-servicing on a particular mortgage to

- 6 -

another company), or at least should have ensured extra precautions to secure such PII since, under such circumstances, there was effectively no longer a "legitimate business 'need to know'" for accessing it.

**B.    The Data Breach**

23.    A data breach exposes confidential, sensitive, or protected information to an unauthorized person. In a data breach, said confidential and private information is viewed and/or shared without permission.

24.    According to AFR's Data Breach Notification, there was a security incident discovered on an unspecified date in 2021. *See* Ex. A. When AFR learned of the Data Breach, it claims to have conducted a comprehensive review of the files, which concluded on February 4, 2022, and which determined that there had been a massive data breach involving Plaintiff's and Class Members' PII. *See id.*

25.    AFR either did not encrypt or adequately encrypt Plaintiff's and the Class Members' PII.

26.    The Data Breach itself took place between December 6, 2021 and December 20, 2021.  So, for two weeks, unauthorized third parties had access to AFR's trove of highly sensitive and unencrypted PII without detection.

27.    However, rather than promptly inform consumers about the seriousness and the well-known dangers of data breaches – and of this particular Data Breach, specifically – AFR opted not to inform consumers until over a month after the discovery of the Data Breach, on March 9, 2022, and even then, misled Plaintiff and Class Members about the full scope of the breach.

28.    AFR's delay in notifying the victims of the Data Breach violates provisions of the New Jersey Consumer Security Breach Disclosure Act, which required AFR, once it knew or had

reason to know of a data security breach involving personal information, to provide prompt and direct notice of such breach to any affected.

29.    The Data Breach resulted in unauthorized access to the sensitive data of consumers that used AFR's services. Because of the Data Breach, thousands of Class Members' suffered ascertainable losses inclusive of identity theft, reduced credit scores, out-of-pocket expenses, and the value of their time incurred to remedy or mitigate the effects of the attack and the present risk of imminent harm caused by the compromise of their sensitive personal information, including their name, Social Security number and Driver's License number.

30.    AFR received Plaintiff's and Class Members' highly sensitive PII with the reasonable expectation and the mutual understanding that AFR would comply with its obligations to keep such information confidential and secure from unauthorized access. AFR's data security obligations were particularly important given the substantial increase in data breaches preceding the date of the Data Breach.

31.    Therefore, the increase in such attacks, and the attendant risk of future attacks was widely known to the public and to anyone in the AFR's industry, including the AFR itself.

**C.    AFR Fails To Comply With FTC Guidelines**

32.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

33.    In 2016, the FTC updated its publication, "Protecting Personal Information: A Guide for Business," which established cyber-security guidelines for businesses. There, the FTC advises that businesses should protect the personal information that they keep; properly dispose of

personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The FTC also recommends that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

34.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

35.     In addition, the FTC advised that "If you don't have a legitimate business need for sensitive personally identifying information, don't keep it."

36.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

37.     AFR failed to properly implement basic data security practices, including several of the practices listed above.

38.     AFR's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' PII constitutes an unfair act or practice prohibited by the FTCA.

39.     AFR was at all times fully aware of its obligation to protect the PII of its subjects. AFR was also aware of the significant repercussions that would result from its failure to do so.

40.     Several best practices have been identified that at a minimum should be implemented by companies like AFR, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

41.     Other best cybersecurity practices that are standard in AFR's industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

42.     AFR failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

43.     These foregoing frameworks are existing and applicable industry standards in AFR's industry, and AFR failed to implement and/or comply with these accepted standards, thereby opening the door to and causing the Data Breach.

### D.     AFR'S Breach

44.     AFR breached its obligations to Plaintiff and the Class Members and was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data.  AFR's unlawful conduct includes, but is not limited to, the following acts and omissions:

(a)     Failing to maintain an adequate data security system to reduce the risk of data breaches;

(b)     Failing to adequately protect consumers' PII;

(c)     Failing to properly monitor its own data security systems for existing intrusions;

(d)     Failing to comply with the FTC guidelines for cybersecurity, in violation of the FTCA; and

(e)     Failing to adhere to industry standards for cybersecurity.

45.     AFR negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyber-thieves to access AFR's IT systems which contained unsecured and unencrypted PII.

46.     Accordingly, as outlined below, Plaintiff and Class Members now face an increased risk of fraud and identity theft.

### E.     Harm To Consumers

47.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

48.     There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

49.     Thus, Plaintiff and Class Members must vigilantly monitor their financial accounts for many years to come.

50.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

51.     Moreover, it is not an easy task to change or cancel a stolen Social Security number.

52.     An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number.

53.     Driver's license numbers are also incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."

54.     Victims of driver's license number theft also often suffer unemployment benefit fraud.

55.     The fraudulent activity resulting from the Data Breach may not become evident for years.

- 12 -

56.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used.

57.     At all relevant times, AFR knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, including Social Security numbers, driver's license numbers, and financial account information, and of the foreseeable consequences that would occur if AFR's data security system and network was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

58.     AFR knew or should have known about these dangers and strengthened its data, IT, and email handling systems accordingly. AFR was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

**F.    Harm To Plaintiff**

59.     Prior to the Data Breach, AFR received Dr. Oliva's PII after purchasing his mortgage from his prior lender.  Thereafter, AFR sold his mortgage to TIAA-CREF (effective December 1, 2018), but continued to possess Dr. Oliva's PII after the sale for more than three years later, and the Data Breach occurring more than three years from that mortgage sale.  Thus, AFR had no legitimate business need to keep Dr. Oliva's PII, much less keep it wholly unsecure.

60.     Dr. Oliva is extremely careful about sharing his PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.  He also does his best to store any and all documents containing sensitive PII in a secure location, and destroys any documents he receives in the mail that contain PII or that may contain any information that could otherwise be used to compromise his identity and financial accounts, or otherwise secures in a locked filing cabinet or personal safe for documents that need to be retained.  He also diligently

chooses unique usernames and passwords for his various online accounts.  In addition, Dr. Oliva password-protects documents containing PII, and does not release his birthdate on social media sites, *etc.*, as a precautionary measure from identity fraud.

61.    To prevent PII compromise and fraudulent activity against his bank and other accounts, Dr. Oliva has intentionally requested from his bank not to have a debit card.  Instead, Dr. Oliva only uses third-party credit cards for all purchases as much as possible, including separate credit cards for consumer purchases and utilities, to protect his bank and other accounts. These cards are then paid in full each month.  In addition, Dr. Oliva does not have PIN numbers set-up on his credit card as an extra layer of protection to prevent unauthorized cash advance withdrawals.

62.    In March 2022, Dr. Oliva received the Notice Letter from AFR informing him that his full name and Social Security number were accessed by unauthorized third parties, and that his Driver's License information was potentially accessed as well.  *See* Ex. A.  In the Notice Letter, AFR advised Dr. Oliva to take certain steps to protect his PII and otherwise mitigate his damages. AFR never notified Dr. Oliva that his date of birth was also compromised in the Data Breach.

63.    Dr. Oliva has suffered several varieties of actual injuries as a result of the Data Breach.

64.    Specifically, as a direct and proximate result of the Data Breach, Dr. Oliva has become a recent victim of identity theft and has had an unauthorized person attempt to fraudulently obtain a home equity line of credit in his name.  As a result, Dr. Oliva's credit score dropped, which negatively impacts his ability to receive financing as well as negatively impacts potential interest rates for consumer items.

65.     Moreover, as a result of the Data Breach and the directives that he received in the Notice Letter, Dr. Oliva has already spent precious hours dealing with the consequences of the Data Breach (*e.g.*, self-monitoring his bank and credit accounts, dealing with an attempted HELOC fraud), as well as his time spent verifying the legitimacy of the Notice of Data Breach, communicating with his bank, exploring credit monitoring and identity theft insurance options, among other things. This time has been lost forever and cannot be recaptured.  Given the short time-frame the attempted identity theft occurred in from the time of the Data Breach, it is reasonable to expect that Dr. Oliva will continue to have to devote significantly more precious time and resources to the aftermath of the Data Breach for many years to come.

66.     Furthermore, Dr. Oliva has suffered an injury to the value of his PII, which is a form of property, insofar as its value has been diminished by the Data Breach.

67.     Dr. Oliva has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach, and he has suffered anxiety and increased concerns for the loss of his privacy since he received the Notice Letter. He is especially concerned about the theft of his full name paired with his Social Security number and date of birth, which is readily obtainable from the driver's license AFR notified him may have been stolen in the Data Breach.

68.     Dr. Oliva has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his stolen PII, especially his Social Security number, being placed in the hands of unauthorized third-parties and possibly criminals.

69.     Dr. Oliva has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in AFR's possession, is protected and safeguarded from future breaches.

## V.    CLASS ALLEGATIONS

70.    Plaintiff brings this Class Action Complaint on behalf of himself and the Class Members pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4).

71.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons residing in the United States whose PII was compromised in the Data Breach (the "Nationwide Class" or the "Class").

72.    The Nationwide Class asserts claims under New Jersey law against AFR for: (1) negligence, (2) negligence *per se*, (3) breach of confidence, (4) intrusion upon seclusion, (5) breach of implied contract, (6) unjust enrichment, and (7) violations of New Jersey state consumer protection statutes.

73.    Alternatively, Plaintiff seeks certification of Florida law claims on behalf of an alternative Florida Class, defined as follows:

> All natural persons residing in Florida whose Personal Information was compromised in the Data Breach (the "Florida Class").

74.    The alternative Florida Class asserts claims under Florida law against AFR for: (1) negligence, (2) negligence *per se*, (3) breach of confidence, (4) intrusion upon seclusion, (5) breach of implied contract, (6) unjust enrichment, and (7) violations of Florida state consumer protection statutes.

75.    Excluded from the Nationwide Class and the alternative Florida Class are AFR, any entity in which either AFR has a controlling interest, and either AFR's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Nationwide Class and the alternative Florida Class are any judicial officers presiding over this matter, members of their immediate family, and members of their judicial staff.

76.    **Numerosity**.  The Members of the Class are so numerous that joinder of all of them

is impracticable.  While the exact number of Class Members is unknown to Plaintiff at this time,

based on information and belief, the Nationwide Class consists of tens of thousands of individuals

whose sensitive data was compromised in the Data Breach. The alternative Florida Class more

than likely contains thousands of Class Members throughout the state.

77.    **Commonality**.  There are questions of law and fact common to the Class, which

predominate over any questions affecting only individual Class Members. These common

questions of law and fact include, without limitation:

(a)    Whether AFR unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII;

(b)    Whether AFR failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

(c)    Whether AFR's data security systems prior to, during, and after the Data Breach complied with the applicable data security laws and regulations;

(d)    Whether AFR's data security systems prior to and during the Data Breach were consistent with industry standards, as applicable;

(e)    Whether AFR owed a duty to Class Members to safeguard their PII;

(f)    Whether AFR breached a duty to Class Members to safeguard their PII;

(g)    Whether unauthorized third parties accessed or obtained Class Members PII in the Data Breach;

(h)    Whether the AFR knew or should have known that its data security systems and monitoring processes were deficient;

(i)    Whether the Plaintiff and Class Members suffered legally cognizable injuries as a result of the AFR's misconduct;

(j)    Whether AFR's conduct was negligent;

(k)    Whether AFR was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

(l)     Whether AFR failed to provide notice of the Data Breach in a timely manner; and

(m)     Whether Plaintiff and Class Members are entitled to damages, civil penalties, and/or injunctive relief.

78.     **Typicality**.  Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

79.     **Adequacy of Representation**.  Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class.  Plaintiff's Counsel are competent and experienced in litigating class actions and data breach cases.

80.     **Predominance**.  AFR has engaged in a common course of conduct toward Plaintiff and Class Members, in that all of Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from AFR's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

81.     **Superiority**.  A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for AFR. In contrast, the conduct of this action as a Class action presents far fewer management difficulties,

conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

82.    AFR has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## VI.    CAUSES OF ACTION

### COUNT I: NEGLIGENCE
**On Behalf of Plaintiff and the Nationwide Class, or
Alternatively, on Behalf of Plaintiff and the Florida Class**

83.    Plaintiff repeats the allegations contained in paragraphs 1 through 82 as if fully set forth herein.

84.    AFR acquired Plaintiff's and Class Members' PII as part of its residential mortgage financing business.  AFR collected and stored the PII for commercial gain.

85.    AFR knew or should have known that its systems were vulnerable to unauthorized access and exfiltration by third parties.

86.    AFR had a duty to maintain adequate and commercially reasonable data security practices to ensure the protection of customers' PII.

87.    AFR owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII within its control from being compromised, lost, stolen, accessed and misused by unauthorized persons.

88.    AFR owed a duty of care to Plaintiff and Members of the Class to provide security, consistent with industry standards, to ensure that the systems and networks adequately protected the PII.

89.     AFR's duty to use reasonable security measures arose as a result of the special relationship that existed between AFR and the Plaintiffs and Class Members.  The special relationship arose because AFR received Plaintiff's and Class Members' confidential data as part of the financial process for obtaining residential mortgages.  Only AFR was in a position to ensure that it had sufficient safeguards to protect against the harm to Plaintiff and Class Members that would result from a data breach.

90.     AFR's duty to use reasonable care in protecting PII arose as a result of the common law and the statutes and regulations, as well as its own promises regarding privacy and data security to its customers.  This duty exists because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices.  By collecting and maintaining personal and confidential information of Plaintiff and Class Members, and acknowledging that this information needed to be kept secure, it was foreseeable that they would be harmed in the future if AFR did not protect Plaintiff's and Class Members' information from threat actors.

91.     AFR's duties also arose under the FTCA, which prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect personal and confidential information.  Various FTC publications and data security breach orders further form the basis of AFR's duty.  In addition, several individual states have enacted statutes based upon the FTC Act that also created a duty.

92.     AFR knew, or should have known, of the risks inherent in collecting and storing PII, the vulnerabilities of its systems, and the importance of adequate security.

93.    AFR breached its common law, statutory, and other duties – and thus were negligent – by failing to use reasonable measures to protect customers' PII, and by failing to provide timely and adequately detailed notice of the Data Breach.

94.    AFR breached its duties to Plaintiff and Class Members in numerous ways, including by:

a.    Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiff's and Class Members' PII;

b.    Failing to comply with industry standard data security standards during the period of the Data Breach;

c.    Failing to adequately monitor and audit its data security systems;

d.    Failing to comply with regulations protecting the PII at issue during the period of the Data Breach;

e.    Failing to adequately monitor, evaluate, and ensure the security of its network and systems;

f.    Failing to recognize in a timely manner that Plaintiff's and other Class Members' PII had been compromised;

g.    Failing to timely and adequately disclose that Plaintiff's and Class Members' PII had been improperly acquired or accessed; and

h.    Failing to purge or otherwise make an inaccessible archive of the PII of AFR's former customers, including Plaintiff and other Class Members.

95.    Plaintiff's and Class Members' PII would not have been compromised in the Data Breach but for AFR's wrongful and negligent breach of its duties.

96.    AFR's failure to take proper security measures to protect sensitive PII of Plaintiffs and Class Members as described in this Class Action Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of PII of Plaintiff and Class Members.

97.     It was also foreseeable that AFR's failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiff and other Class Members.

98.     Neither Plaintiff nor, upon information and belief, the other Class Members contributed to the Data Breach and subsequent misuse of their PII as described in this Class Action Complaint.

99.     As a direct and proximate cause of AFR's conduct, Plaintiff and the Class suffered damages and will suffer damages including, but not limited to: damages arising from identity theft or fraud; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take years to discover and detect; and loss of the value of their privacy and confidentiality of the stolen confidential data, including financial data.

100.    Accordingly, Plaintiff, individually and on behalf of all those similarly situated, seeks an order declaring that AFR's conduct constitutes negligence and awarding damages in an amount to be determined at trial.

**COUNT II: NEGLIGENCE PER SE**
**On Behalf of Plaintiff and the Nationwide Class, or**
**Alternatively, on Behalf of Plaintiff and the Florida Class**

101.    Plaintiff repeats the allegations contained in paragraphs 1 through 82 as if fully set forth herein.

102.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as AFR, of failing to use reasonable measures to protect PII. 15 U.S.C. §45(a)(1).

103.    The FTC publications and orders described above also form part of the basis of AFR's duty in this regard.

104.    AFR violated the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards.  AFR's conduct was particularly unreasonable given the nature and amount of PII it obtained, stored, and disseminated, and the foreseeable consequences of a data breach involving companies as large as AFR, including, specifically, the immense damages that would result to Plaintiff and Class Members.

105.    AFR's violations of the FTCA constitute negligence *per se*.

106.    Plaintiff and Class Members are within the class of persons that the FTCA was intended to protect.

107.    The harm that occurred as a result of the Data Breach is the type of harm the FTCA was intended to guard against.  The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

108.    As a direct and proximate result of AFR's negligence *per se* under the FTCA, Plaintiff and the Class have suffered, continue to suffer, and will suffer, injuries, damages, and harm as set forth herein.

<u>**COUNT III: BREACH OF CONFIDENCE**</u>
**On Behalf of Plaintiff and the Nationwide Class, or**
**Alternatively, on Behalf of Plaintiff and the Florida Class**

109.    Plaintiff repeat the allegations contained in paragraphs 1 through 82 as if fully set forth herein.

110.    AFR and Plaintiff and Class Members maintained a confidential relationship, whereby AFR undertook a duty not to disclose the PII provided to AFR to unauthorized third

parties.  Such PII was confidential and novel, highly personal and sensitive, and not generally known.

111.    AFR knew Plaintiff's and Class Members' PII was being disclosed in confidence and understood the confidence was to be maintained, including by expressly and implicitly agreed to protect the confidentiality and security of the PII they collected, stored, and maintained.

112.    As a result of the Data Breach, there was an unauthorized disclosure of Plaintiff's and Class Members' PII in violation of this understanding.  The unauthorized disclosure occurred because AFR failed to implement and maintain reasonable safeguards to protect the PII in its possession and failed to comply with industry-standard data security practices.

113.    Plaintiff and Class Members were harmed by way of an unconsented disclosure of their confidential information to an unauthorized third party.

114.    As a direct and proximate result of AFR's breach of confidence, Plaintiff and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiff and Class Members alternatively seek an award of nominal damages.

### COUNT IV: INVASION OF PRIVACY – INTRUSION UPON SECLUSION
**On Behalf of Plaintiff and the Nationwide Class, or**
**Alternatively, on Behalf of Plaintiff and the Florida Class**

115.    Plaintiff repeat the allegations contained in paragraphs 1 through 82 as if fully set forth herein.

116.    AFR intentionally intruded into Plaintiff's and Class Members' seclusion by failing to keep their PII secure.

117.    By failing to keep Plaintiff's and Class Members' PII secure, and allowing for access and disclosing of the PII to unauthorized parties for unauthorized use, AFR unlawfully invaded Plaintiff's and Class Members' privacy right to seclusion by, *inter alia*:

(a)      intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

(b)      invading their privacy by improperly using their PII properly obtained for a specific purpose for another purpose, or disclosing it to unauthorized persons;

(c)      failing to adequately secure their PII from disclosure to unauthorized persons; and

(d)      enabling the disclosure of their PII without consent.

118.    The PII that was publicized during the Data Breach was highly sensitive, private, and confidential, as it included private financial, employment, and personal information.

119.    As a direct and proximate result of AFR's intrusion upon seclusion, Plaintiff and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiff and Class Members alternatively seek an award of nominal damages.

<u>**COUNT V: UNJUST ENRICHMENT**</u>
**On Behalf of Plaintiff and the Nationwide Class, or**
**Alternatively, on Behalf of Plaintiff and the Florida Class**

120.    Plaintiff repeat the allegations contained in paragraphs 1 through 82 as if fully set forth herein.

121.    For years and continuing to today, AFR's business model has depended upon it being entrusted with customers' PII. Trust and confidence are critical and central to the services provided by AFR in the residential financing industry. Unbeknownst to Plaintiff and absent Class Members, however, AFR did not secure, safeguard, or protect customer data and employed deficient security procedures and protocols to prevent unauthorized access to customers' PII. AFR's deficiencies described herein were contrary to their security messaging.

122.    Plaintiff and absent Class Members received services from AFR, and AFR was provided with, and allowed collect, their PII on the mistaken belief that AFR complied with their

duty to safeguard and protect customer PII. Putting their short-term profit ahead of safeguarding PII, and unbeknownst to Plaintiff and absent Class Members, AFR knowingly sacrificed security in an attempt to save money.  AFR knew that the manner in which they maintained and transmitted customer PII violated their fundamental duties to Plaintiff and absent Class Members by neglecting well-accepted security to ensure confidential information was not accessible to unauthorized access. AFR had knowledge of methods for designing safeguards against unauthorized access and eliminating the threat of exploit, but it did not use such methods.

123.    AFR had within its exclusive knowledge, and never disclosed, that they had failed to safeguard and protect Plaintiff's and absent Class Members' PII.  This information was not available to Plaintiff, absent Class Members, or the public at large.

124.    AFR also knew that Plaintiff and absent Class Members expected security against known risks and that they were required to adhere to state and federal standards for the protection of confidential personally identifying, financial, and other personal information.

125.    Plaintiff and absent Class Members did not expect that AFR would knowingly insecurely maintain and distribute their PII, especially former customers whose PII AFR had no legitimate business reason to maintain. Likewise, Plaintiff and absent Class Members did not expect that AFR employed substantially deficient security and fail to undertake any required monitoring or supervision of its data.

126.    Had Plaintiff and absent Class Members known about AFR's efforts to hide their failure to safely guard and protect PII entrusted to them, Plaintiff and absent Class Members would have taken steps to ensure that AFR had completely destroyed their PII upon selling Plaintiff's mortgage to TIAA-CREF or another mortgage-servicing company.

127.    By withholding the facts concerning the defective security and protection of customer PII, AFR put their own interests ahead of the very customers who placed their trust and confidence in AFR, and benefitted themselves to the detriment of Plaintiff and absent Class Members.

128.    As a result of its conduct as alleged herein, AFR sold more services than it otherwise would have, and was able to charge Plaintiff and Class Members more for AFR's mortgage services than it otherwise could have. AFR was unjustly enriched by charging for and collecting for those services to the detriment of Plaintiff and absent Class Members.

129.    It would be inequitable, unfair, and unjust for AFR to retain these wrongfully obtained benefits. AFR's retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

130.    AFR's defective security and their unfair and deceptive conduct have, among other things, caused Plaintiff and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their private PII.

131.    Plaintiff and each Member of the proposed Classes is entitled to restitution and non-restitutionary disgorgement in the amount by which AFR were unjustly enriched, to be determined at trial.

**COUNT VI: BREACH OF IMPLIED CONTRACT**
**On Behalf of Plaintiff and the Nationwide Class, or**
**Alternatively, on Behalf of Plaintiff and the Florida Class**

132.    Plaintiff repeat the allegations contained in paragraphs 1 through 82 as if fully set forth herein.

133.    When Plaintiff and Class Members paid money and provided their PII to AFR in exchange for goods or services, they entered into implied contracts with AFR pursuant to which

AFR agreed to safeguard and protect such information and to timely and accurately notify them if their data had been breached and compromised.

134.    AFR solicited and invited prospective customers to provide their PII as part of its regular business practices. These individuals accepted AFR's offers and provided their PII to AFR. In entering into such implied contracts, Plaintiff and the Class assumed that AFR's data security practices and policies were reasonable and consistent with industry standards, and that AFR would use part of the funds received from Plaintiff and the Class to pay for adequate and reasonable data security practices.

135.    Plaintiff and the Class would not have provided and entrusted their PII to AFR in the absence of the implied contract between them and AFR to keep the information secure.

136.    Plaintiff and the Class fully performed their obligations under the implied contracts with AFR.

137.    AFR breached its implied contracts with Plaintiff and the Class by failing to safeguard and protect their PII and by failing to provide timely and accurate notice that their PII was compromised as a result of the Data Breach.

138.    As a direct and proximate result of AFR's breaches of their implied contracts, Plaintiff and the Class sustained actual losses and damages as described herein.

### COUNT VII: NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. § 56:8-2
#### On Behalf of Plaintiff and the Nationwide Class

139.    Plaintiff repeat the allegations contained in paragraphs 1 through 82 as if fully set forth herein.

140.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression

or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A. § 56:8-2.

141.    By the acts and conduct alleged herein, AFR committed unfair or deceptive acts and practices by:

(a)    failing to maintain adequate computer systems and data security practices to safeguard PII;

(b)    failing to disclose that its computer systems and data security practices were inadequate to safeguard PII from theft;

(c)    continuing to gather and store PII, and other personal information after AFR knew or should have known of the security vulnerabilities of its computer systems that were exploited in the data breach;

(d)    continuing to gather and store PII, and other personal information after AFR knew or should have known of the Data Breach and before AFR allegedly remediated the data security incident; and

(e)    continuing to store and maintain the PII of former customers when AFR had no legitimate business need to do so.

142.    These unfair acts and practices violated duties imposed by laws, including but not limited to the FTCA, the Gramm- Leach-Bliley Act, and the New Jersey CFA.

143.    The foregoing deceptive acts and practices were directed at New Jersey consumers/purchasers.

144.    AFR, Plaintiff, and Class Members are "persons" within the meaning of N.J.S.A. § 56:8-1(d).

145.    AFR engaged in "sales" of "merchandise" within the meaning of N.J.S.A. § 56:8-1(c), (d).

146.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the character of the financial services provided, specifically as to the safety and security of PII, and other personal and private information, to induce consumers to purchase the same.

147.    AFR's unconscionable commercial practices, false promises, misrepresentations, and omissions set forth in this Class Action Complaint are material in that they relate to matters which reasonable persons, including Plaintiff and Members of the Class, would attach importance to in making their purchasing decisions or conducting themselves regarding the purchase of services from AFR.

148.    Plaintiff and Class Members are consumers who made payments to Defendant for the furnishing of financial services that were primarily for personal, family, or household purposes.

149.    AFR engaged in the conduct alleged in this Class Action Complaint, entering into transactions intended to result, and which did result, in the furnishing of services to consumers, including Plaintiff and Class Members. AFR's acts, practices, and omissions were done in the course of AFR's business of marketing, offering to sell, and furnishing services from the State of New Jersey. As a direct and proximate result of AFR's multiple, separate violations of N.J.S.A. § 56:8-2, Plaintiff and the Class Members suffered damages including, but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the data breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their PII, which remains in AFR's

possession and is subject to further unauthorized disclosures so long as AFR fails to undertake appropriate and adequate measures to protect the PII in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of AFR's services they received.

150.    Also as a direct result of AFR's violation of the New Jersey Consumer Fraud Act, Plaintiff and the Class Members are entitled to damages as well as injunctive relief, including, but not limited to, ordering AFR to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members. Plaintiff and Class Members were injured because: a) they would not have paid for Defendant's services had they known the true nature and character of AFR's data security practices; b) would not have entrusted their PII to AFR in the absence of promises that Defendant would keep their information reasonably secure, and c) would not have entrusted their PII to Defendant in the absence of the promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

151.    As a result, Plaintiff and the Class Members have been damaged in an amount to be proven at trial.

152.    On behalf of themselves and other members of the Class, Plaintiff is entitled to recover legal and/or equitable relief, including an order enjoining AFR's unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J.S.A. § 56:8-19, and any other just and appropriate relief.

## CLAIMS ON BEHALF OF THE ALTERNATIVE FLORIDA CLASS

## COUNT VIII: FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, Fla. Stat. §§ 501.201, *et seq.*
### On Behalf of Plaintiff and the Alternative Florida Class

153.    Plaintiff repeat the allegations contained in paragraphs 1 through 82 as if fully set forth herein.

154.    Plaintiff bring this claim on behalf of himself and the alternative Florida Class.

155.    This cause of action is brought pursuant the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which, pursuant to Fla. Stat. § 501.202, requires such claims be "construed liberally" by the courts "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

156.    AFR's offer, provision, and sale or services at issue in this case are "consumer transaction[s]" within the scope of the FDUTPA.  *See* Fla. Stat. §§ 501.201-501.213.

157.    Plaintiff and the Class Members, as "individual[s]," are "consumer[s]" as defined by the FDUTPA.  *See* Fla. Stat. § 501.203(7).

158.    AFR provided residential mortgage services on Plaintiff's and the Class Members' behalf.

159.    AFR offered, provided, or sold services in Florida and engaged in trade or commerce directly or indirectly affecting the consuming public, within the meaning of the FDUTPA.  *See* Fla. Stat. § 501.203.

160.    Plaintiff and the Class Members paid for or otherwise availed themselves and received services from AFR, primarily for personal, family, or household purposes.

- 32 -

Case 2:22-cv-02642-MCA-JSA    Document 1    Filed 05/05/22    Page 33 of 38 PageID: 33


161.    AFR engaged in the conduct alleged in this Class Action Complaint, entering into transactions intended to result, and which did result, in the procurement or provision of residential mortgage services to or for Plaintiff and Class Members.

162.    AFR's acts, practices, and omissions were done in the course of AFR's business of offering, providing, and selling residential mortgage services throughout Florida and the United States.

163.    The unfair, unconscionable, and unlawful acts and practices of AFR alleged herein, and in particular the decisions regarding data security, emanated and arose – as respect to Florida Class Members, within the state of Florida, within the scope of the FDUTPA.

164.    AFR, operating in Florida, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. §501.204(1), including but not limited to the following:

(a)    failing to implement and maintain reasonable and adequate computer systems and data security practices to safeguard customer PII;

(b)    omitting, suppressing, and concealing the material fact that their computer systems and data security practices were inadequate to safeguard customer PII from unauthorized access and theft;

(c)    failing to protect the privacy and confidentiality of Plaintiffs' and Class Members' PII;

(d)    continuing to accept and store customer PII after AFR knew or should have known of the security vulnerabilities that were exploited in the Data Breach;

(e)    continuing to accept and store customer PII after AFR knew or should have known of the Data Breach and before it allegedly remediated the Data Breach; and

(f)    continuing to store and maintain the PII of former customers when AFR had no legitimate business need to do so.

165.    These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including by not limited to the FTC Act, 15 U.S.C. § 41, *et seq.*, and the FDUTPA, Fla. Stat. § 501.171(2).

166.    AFR knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Class Members' PII and that the risk of a data breach or theft was high.

167.    Plaintiff has standing to pursue this claim because as a direct and proximate result of AFR's violations of the FDUTPA, Plaintiff and Class Members have been "aggrieved" by a violation of the FDUTPA and bring this action to obtain a declaratory judgment that AFR's acts or practices violate the FDUTPA.  *See* Fla. Stat. § 501.211(a).

168.    Plaintiff also has standing to pursue this claim because, as a direct result of AFR's knowing violation of the FDUTPA, Plaintiff is at a substantial and imminent risk of future identity theft.  AFR still possess Plaintiff's and the Class Members PII, and Plaintiff's PII has been both accessed and misused by unauthorized third parties, which is evidence of a substantial and imminent risk of future identity theft for Plaintiff and all Class Members.

169.    Plaintiff and Class Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future identity theft, including, but not limited to:

(a)    ordering that AFR engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on its systems on a periodic basis, and ordering prompt correction of any problems or issues detected by such third-party security auditors;

(b)    ordering that AFR engage third-party security auditors and internal personnel to run automated security monitoring;

(c)    ordering that AFR audit, test, and train security personnel regarding any new or modified procedures;

(d)    ordering that AFR segment customer data by, among other things, creating firewalls and access controls so that if one area of a network system is compromised, hackers cannot gain access to other portions of the system;

(e)    ordering that AFR purge, delete, and destroy customer PII not necessary for its provisions of services in a reasonably secure manner;

(f)    ordering that AFR conduct regular database scans and security checks;

(g)    ordering that AFR routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

(h)    ordering AFR to meaningfully educate customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps present and former customers should take to protect themselves.

170.    Plaintiff also has standing to pursue this claim because as a direct and proximate result of AFR's violations of FDUTPA, he suffered actual damages in the form of actual identity theft and reduction of his credit score, and lost time devoted to dealing with these.

171.    Plaintiff bring this action on behalf of themselves and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class Members and the public from AFR's unfair methods of competition and unfair, unconscionable, and unlawful practices. AFR's wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

172.    The above unfair, unconscionable, and unlawful practices and acts by AFR were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

173. AFR's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices and described herein were negligent, knowing and willful, and/or wanton and reckless.

174. Plaintiff and Class Members seek relief under the FDUTPA, Fla. Stat. §§ 501.201, *et seq.*, including, but not limited to, damages, restitution, a declaratory judgment that AFR's actions and/or practices violate the FDUTPA; injunctive relief enjoining AFR, their employees, parents, subsidiaries, affiliates, executives, and agents from violating the FDUTPA, ordering that AFR engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on its systems on a periodic basis, and ordering prompt correction of any problems or issues detected by such third-party security auditors, ordering that AFR engage third-party security auditors and internal personnel to run automated security monitoring, ordering that AFR audit, test, and train security personnel regarding any new or modified procedures, ordering that AFR segment customer data by, among other things, creating firewalls and access controls so that if one area of a network system is compromised, hackers cannot gain access to other portions of the system, ordering that AFR purge, delete, and destroy customer PII not necessary for its provisions of services in a reasonably secure manner, ordering that AFR conduct regular database scans and security checks, ordering that AFR routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach, ordering AFR to meaningfully educate customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps current and former customers should take to protect themselves, attorneys' fees and costs, and any other just and proper relief.

VII.    **PRAYER FOR RELIEF**

      **WHEREFORE**, Plaintiff prays for judgment as follows:

        (a)     For an Order certifying this action as a Class action and appointing Plaintiff and his counsel to represent the Class;

        (b)     For equitable relief enjoining AFR from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

        (c)     For equitable relief compelling AFR to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised by the Data Breach.

VIII.    **JURY TRIAL DEMAND**

      A jury trial is demanded by Plaintiff and the putative Class Members as to all issues so triable

DATED:  May 5, 2022                    **CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**


                                       */s/James E. Cecchi*
                                       JAMES E. CECCHI
                                       LINDSEY H. TAYLOR
                                       KEVIN G. COOPER
                                       5 Becker Farm Road
                                       Roseland, NJ 07068
                                       Telephone:  973/994-1700
                                       Facsimile: 973/994-1744
                                       jcecchi@carellabyrne.com
                                       ltaylor@carellabyrne.com
                                       kcooper@carellabyrne.com

                                       **ROBBINS GELLER RUDMAN**
                                         **& DOWD LLP**
                                       STUART A. DAVIDSON
                                       ALEXANDER C. COHEN
                                       120 East Palmetto Park Rd., Suite 500
                                       Boca Raton, FL  33432
                                       Telephone:  561/750-3000
                                       Facsimile: 561/750-3364
                                       sdavidson@rgrdlaw.com
                                       acohen@rgrdlaw.com

                                       *Attorneys for Plaintiff and the Class*